Each side will have 15 minutes, and Ms. Bliss, you may begin when you're ready. Yes, good morning. Kathleen Bliss on behalf of Jaime Munoz. Your Honors, there are two primary issues that I want to address with you today, one requiring reversal as a matter of law, the other one requiring a remand. As to the first, the first issue involves the trial court's erroneous findings allowing post-inducement evidence, if you can call it that, to be admitted as rebuttal of the entrapment defense that was raised by Mr. Munoz. There's no question that that was an affirmative defense that he raised, thereby shifting it to the government to prove that there was no entrapment beyond a reasonable doubt. Here what the judge did is the judge relied on the Ninth Circuit case Gomez as authority for allowing post-inducement conduct. So when you strip that away, all we're really left prior to the initial contact about the sale of fentanyl on July 21st, all we're left with is really a folded napkin and a statement which the government cited as Exhibit 17A, where the informant, Mr. Trepp, says, can you sell me those pills again? Can I get those pills from you again? Both of which are hearsay. So the error of the defendant's statement is not hearsay, is it? He didn't say that. No, he said if the buyer has the money, I can get whatever he wants. So that's admissible, is it not? Oh, of course it would be admissible. Okay. But does it indicate that he's going to possess fentanyl with the intent to distribute? No. Standing alone, it doesn't. But I want to talk about the inducement itself first, because I think that that was something that was. Would you first say specifically what testimony you think was erroneously admitted specifically? All of the testimony from the Snapchats and the interactions with the undercover officer as well as with Mr. Trepp after July 21. That is post-inducement evidence that should never have come in. Gomez, which the Court relied on, Your Honor, was based on 405A reputation evidence. There was a dissent in that case, by the way, as well. So is it your position? This is not your case, but I'm going to give you a hypothetical. Let's say a week or a month after the event in question here, a defendant says, I was so delighted that I got to sell the fentanyl pills to the CI because, you know, it's more money than I've made in years from all my other sales. You think that can't come in? Not no. I don't. Not if you find inducement from the prior interaction. But if the question is predisposition and someone says, hey, man, I've been doing this for years, why isn't that relevant? Well, if he says I've been doing this for years, then that does show prior conduct. But if he's never, and Your Honor, there is absolutely no evidence whatsoever that Jaime Munoz ever sold fentanyl prior. No, but he gave other drugs to people. So it wasn't fentanyl. And the point is, no, it has to be specific to it. You've got to look at the Pullman case. But the person has to be induced who wouldn't otherwise do it. I mean, if I'm a regular heroin seller and somebody says, hey, can you get me some fentanyl also? And I say, if you've got the money, I'll get the stuff. Is that other activity not relevant? No, Your Honor. It's not relevant because you're talking about fentanyl, which is a much more serious crime. And that's the new crime that is occurring. We can go back to the Sherman case. Mr. Sherman had two prior drug convictions. And the Supreme Court yet found that because of the way the relationship between the two of them was used, that Mr. Sherman was entrapped. And the Supreme Court refused to overrule the Sorrells case. There's so much tension in an entrapment itself because you've got the government's extreme interest in wanting to curb crime. But yet at the same time, you cannot have the government create a crime. And that's what we have here. The government created the serious crime of selling fentanyl. When there was no predisposition by Mr. Munoz to do so, partying, drinking, smoking, dope, doing all these things that they clearly chattered about, that had nothing to do with the sale of fentanyl, the series of fents. Doing cocaine, for example. Your Honor, it takes 400 grams of cocaine to get to the same guideline level and mandatory minimum as 40 grams of fentanyl. Fentanyl is a much more serious offense. But I want to talk about the inducement really quickly because you cannot ignore the relationship between Jaime Munoz and Warren Tripp. That relationship began in February of 2020. It was cultivated by a mutual love to go to the gym, a mutual love to party, and a mutual history of being bullied, of being taken advantage of. And Mr. Munoz, who was raised to be loyal and love, took quite a liking to Mr. Tripp. And we introduced pictures of the prior relationship, prior to June 3rd, which is a significant date. That's the date after, like within days after Mr. Tripp, who, by the way, was never arrested, according to Agent Cordero, him then introducing an undercover to Mr. Munoz. But then you have to go back between that time, and remember, Mr. Munoz testified extensively about their relationship. That was never rebutted by the government, never. He also testified extensively about Mr. Tripp telling him his dad is dying. My parents are mad at me. I wrecked the Mercedes. I'm going to lose my apartment. I lost my drug connects. Just because Mr. Munoz, who owned a barbershop, knew and heard things in that barbershop, did not make him a dealer of fentanyl. So when you go back to Mr. Munoz's testimony, which, of course, is admitted evidence, Mr. Munoz talks about on July 20th, a pivotal day before the 17A, the interaction at the barbershop with Mr. Tripp occurs. Mr. Tripp is telling Mr. Munoz how badly he needs money because he's going to get kicked out of his apartment. His mother is mad at him. His dad is dying. He appealed greatly to the sympathy of someone who looked at him as a younger brother and wanted to protect him. Mr. Tripp abused that relationship to save himself. Now, very quickly, I want to talk about the second primary issue that we have here, and that is on the application of the guideline, the firearm enhancement, as well as the court denying the safety valve. Again, as I said before, and I did file a 28-J, the Duarte case just came out by the Ninth Circuit, essentially affirming, again, the power of the Bruin decision. I'm sorry, Your Honor. Yeah, I read your 28-J letter with interest, but I had two questions for you. The first is whether you read the guideline to differentiate between lawful and unlawful possession of a firearm, because to me it would cover both. So even if you assume that possession was lawful, the guideline appears to cover it. My second question is we have precedent applying the firearm enhancement in this situation. So as a three-judge panel, how would we be free to overrule that? I don't think any prior precedent. Now, Elaniz is different, if that's the case you're talking about, Your Honor. But I don't believe there's any prior precedent since the Bruin analysis. And I'm not challenging the constitutionality of the guidelines, to be clear. I'm just saying that since the guideline – But since the guideline – I guess the more important question really was my first one, and I'm sorry I muddied it. But it appears to me that the guideline does not differentiate between lawful and unlawful possession. And what you're arguing for, as I understand it, is to assume that the possession was lawful. But I'm not sure how that assists, because if the guideline covers the co-use of a firearm, whether lawful or not, in a drug crime, how does that help you? Well, first of all, there has to be a functional connection. There has to be either way, whether it's lawful or unlawful. So setting that aside, where do you see in the guideline any differentiation between lawful and unlawful, if there is a connection? If there is a connection. And that's the difference. There was no connection here. But that's not a Bruin argument. That's a garden variety, it isn't connected argument. So I'm trying to zero in on what difference it makes under the guideline if the firearm has been possessed lawfully. This is the point that I'm trying to make. And you haven't meddled anything. I'm the one who hasn't made it clear. Ms. Bush, can you stay up at the podium with the microphone? Of course. I'm sorry. I was warned. It's difficult for us to hear you when you step back. Yes, I'm sorry. I'm the one who hasn't made it clear. Under the guidelines, 1B, I mean 1D, 1B1, the defendant has the burden to show that it was improbable that the gun wasn't used in connection with the drug sale. Here, what I'm saying is that under Bruin and now Duarte. Okay. So then maybe you should address the Alanis decision because you raised that. But I think to Judge Graber's point, we have precedent directly on point stating that there is no violation of Bruin in this very specific context. And Duarte was really analyzing the 922G1 provision, which is not at issue here. So we are not free to ignore Alanis, right? I'm not asking you to ignore Alanis. Actually, I would love for you to look at the fact that Alanis found that the safety valve has a different standard because here the judge merged the two. But Alanis forecloses your argument regarding the enhancement. Under 1B1, not 1B18. That's the difference. And Judge Due did not make a distinction between the two, as the government even acknowledged. But going back, the Second Amendment right makes it more probable that the possession was legal. That's the important thing. But I'm asking you what difference does legal possession make if the other requirements of the guideline are met? That is that you sell your lawfully possessed firearm along with some drugs. So I don't see how lawful helps you. If it is sold, I have a firearm that I possess legally, but I've decided to sell it right along with some fentanyl. So what difference does it make to the guideline on the firearm enhancement that the weapon is possessed lawfully? I think it undermines the improbability requirement of the defendant. So I think it lessens the burden. That's what I'm suggesting. However, it has to be emphasized here factually that the government again created this drug-gun connection. So it was the government's creation. It's almost like a sentencing entrapment, a bait-and-switch, as it were. And so that can't be disregarded, how this even came about. I want to make sure that Judge Graber's question has been answered, but I also want to alert you to the fact that you're under a minute now, and I know you wanted to reserve some time. I don't have further questions. Okay. If you would like to reserve a minute, we'll put a minute on the clock for rebuttal, or you can use it now. It's up to you. Sure. I'll take a minute for rebuttal. I think I have 48 seconds left. We'll put a minute on the clock. Thank you, Your Honor. All right. Good morning. May it please the Court. Adam Flake for the United States. It's the government's position that Allianz, I'm not sure how you pronounce it, Allianz, it squarely forecloses the constitutional challenge to the enhancement in the guideline. I think if I understand the argument, which I still may not, it is that it's not a constitutional challenge per se. It's an interpretation of application of the guideline such that if the possession is lawful, then it's presumed that the guideline wouldn't apply or something along those lines. Your Honor, Allianz did actually discuss the harm that the enhancement is intended to address, and what it said was, when it was looking at the historical analogs, it said, you know, our country has a long tradition of preventing the possession of firearms when the presence of a firearm has the potential to make an already dangerous situation more dangerous. And that's exactly the same thing that the guideline does in this case. The Gomez case, which my colleague discussed earlier, it also, it's a case about entrapment, but it also discusses the firearms enhancement. And Gomez clearly says it does not matter if the firearm was for sale as part of the transaction. It doesn't matter if the firearm was unloaded. What matters is when you have an already exceedingly dangerous situation, a clandestine sale of black market goods, and there's a firearm sitting there, it makes it exponentially worse, and that is why the guideline provides an enhancement for possession of a firearm, because it makes an already dangerous situation worse. And lawfulness of possession previously, I take it from your comment, doesn't matter one way or the other? No, Your Honor. It's not in the guideline. And if the Court has any other questions, I'm happy to answer them. Otherwise, I'll concede the rest of my time. All right. Thank you, Mr. Flake. All right. Ms. Bliss, you have one minute for rebuttal. Okay. Let's go back to the functional connection, okay, aside from any lawful possession. Here you have to look at the fact that the government created the possession of the firearm by ordering it up through Mr. Trepp, Mr. Munoz's friend. These cases, for example, Gomez, there was no government activity or conduct that caused the possession of that firearm. Mr. Gomez, they searched his home and they found firearms there. But here you have Mr. Trepp orchestrating the drug sale as well as the gun sale. Again, it's like a bait and switch that the government is trying to impose on Mr. Munoz in order to foreclose him from the safety valve enhancement, definitely, but then adding that firearm enhancement. Thank you. Thank you. Thank you, counsel, for your argument. This case is now submitted.
judges: GRABER, DESAI, ALBA